### Deegans v. Commonwealth.

(Decided March 22, 1929.)

WAUGH & HOWERTON and C. H. BRUCE for appellant.

J. W. CAMMACK, Attorney General, and DOUGLAS C. VEST, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

The appellant, Carlyle Deegans, was convicted of maliciously shooting and wounding another, and his punishment fixed at confinement in the penitentiary for a period of one year. His sole defense was insanity, and the principal ground relied upon by him for reversal is that the trial court erred in overruling his motion for a directed verdict.

Deegans married in 1922. He and his wife became estranged, and on April 2, 1927, when the offense of which he was convicted was committed, he was living with his parents at Coal Grove, Ohio, and his wife was living with her mother, Mrs. Lydia Burns, at Russell, Ky., which is about three miles from Coal Grove. At about 7:45 o'clock in the evening, appellant went to the Burns home, called his wife, and when she came into the hall on the first floor he shot and killed her. Mrs. Burns, who was on the second floor of the house when her daughter was shot, started down the stairs when appellant shot and wounded her.

Two indictments were returned against Deegans, one charging him with the murder of his wife, and one with shooting and wounding Mrs. Burns. On May 11, 1927, he was tried under the indictment charging him with murder. His defense was insanity. The jury failed to agree, and was discharged. The commonwealth's attorney at once initiated proceedings for an inquest, and on May 20, 1927, the court appointed two physicians, Dr. A. S. Brady, of Greenup, and Dr. C. E. Vidt, of Russell, to examine appellant and report on his sanity. They reported that he was of unsound mind, an inquest was held, and the jury found that he was insane. He was so adjudged and was sent to the Eastern State Hospital for the insane in Lexington, Ky., where he remained until October, 1927, when he was discharged.

On April 30, 1928, he was tried upon the charge of maliciously shooting and wounding Lydia Burns with the result above indicated. Practically all of the evidence

was directed to the plea of insanity. Dr. Daniel Webster, a physician of Ironton, Ohio, testified that he examined appellant on December 16, 1926, and found him suffering from neuro syphilis, a type of syphilis that affects the brain and nerves. He found that appellant was insane at that time, and advised appellant's father to take him to an asylum for the insane at once. He saw appellant on May 11, 1927, when the latter was on trial for the murder of his wife, and he stated that appellant was insane at that time. Basing his opinion upon his examination and observation of appellant before and after April 2, 1927, he testified that appellant was insane when he shot and wounded his mother-in-law, and did not then have sufficient reason to know right from wrong, or sufficient will power to control his actions.

Dr. Ralph Massey, a physician of Ironton, Ohio, examined appellant on December 10, 1926, and found that he was insane at that time. In answer to a hypothetical question he stated that appellant on April 2, 1927, when he shot Mrs. Burns, was insane and without sufficient reason to know right from wrong.

Dr. J. W. Lowery, a physician and surgeon of Ironton, Ohio, testified that he had known appellant many years and saw him at Huntington, W. Va., on April 1, 1927, the day before the shooting occurred, and that he was then insane. He saw appellant during the trial in May, 1927, and the latter was then insane.

A number of relatives and neighbors of appellant testified that until about 1925 his state of health was good, his mind bright and active, and his disposition cheery, but that about 2½ years prior to April, 1927, they noticed a change in his mental condition which gradually grew worse. He became morose and moody, and, for several weeks prior to April, 1927, appeared insane. On Monday preceding the Saturday on which the shooting occurred, his family became alarmed at his condition and took him to Huntington, W. Va., where two brothers and two sisters resided. He had been an employee of the Chesapeake & Ohio Railway Company, and they endeavored to have him admitted to a hospital maintained by the Chesapeake & Ohio Railway Company for its employees at Huntington. Dr. W. E. Vest, a physician and surgeon in charge of the Chesapeake & Ohio hospital, examined him on March 29, 1927. He found that he was insane, and refused to receive him at the hospital on that ground. He examined appellant again later in the week,

and again refused to take him into the hospital, and advised those in charge of him to place him in an asylum for the insane. He again saw appellant on May 11, 1927, and a number of times after that date, and stated that on each occasion he saw him appellant was insane and suffering from dementia praecox and neuro syphilis. In answer to a hypothetical question he said that appellant was insane on April 2, 1927.

Dr. C. E. Vidt and Dr. W. E. Vest testified that they were appointed by the court in May, 1927, to examine appellant; that they made a thorough examination and found that he was insane. In answer to a hypothetical question each of them said he was insane on April 2, 1927.

The commonwealth introduced Dr. William R. Thompson, assistant superintendent of the hospital for the insane at Lexington, Ky., and Dr. Edward Davenport, a physician at that institution, who testified that appellant entered the hospital on June 6, 1927, and remained there until some time in October of that year, and that during the time he was confined there they discovered no symptoms indicating that he was suffering from dementia praecox or neuro syphilis. Various tests were made, all of which failed to show the presence of any infection in the spinal fluid, but they admitted there were some indications of syphilis in the blood. In answer to a hypothetical question that had been propounded to the witnesses for appellant, these witnesses for the commonwealth said that, if the facts contained in the question were true, appellant was insane on April 2, 1927, and without sufficient reason to know right from wrong.

Some complaint is made of the facts assumed in the hypothetical question, but all of the facts incorporated therein were supported by substantial evidence. The commonwealth also relied upon the testimony of James Storey, Frank Moore, Tessie Shepherd, and William Callon as supplying sufficient evidence of the sanity of appellant to sustain the verdict. James Storey, who was 16 years of age at the time of the trial, testified that he saw appellant on April 2, 1927, on the Ironton and Russell bridge over the Ohio river. Appellant was going toward Russell, and the witness was going to Ironton. A short conversation took place between them when they met, and the witness testified that appellant then acted and talked like a sane man. Frank Moore, who had known appellant for 3 or 4 years, saw him in the jail where he was confined, and when asked whether or not

appellant was then of sound mind answered: "He recognized me. I went to the window to see him and he recognized me and called me by name." Tessie Shepherd was at the Burns home when appellant shot his wife and mother-in-law. She did not see the shooting, but saw appellant a few minutes thereafter. She observed nothing unusual in his conduct "except he seemed to be mad." William Callon, an employee of the Chesapeake & Ohio Railway company, and whose duty it was to call men by telephone who had been assigned to work, testified that he was acquainted with appellant, and that about 7 o'clock on the evening of April 2, 1927, appellant called him by telephone from Coal Grove and asked if Bass Burns, his wife's brother, and who was a locomotive engineer, had been called. Callon told him that Burns had been called for 7 o'clock, and was then leaving on his run. Appellant said nothing further over the telephone and hung up the receiver. It appears that Bass Burns lived with his mother, with whom appellant's wife was then making her home.

While the evidence introduced by the commonwealth to rebut the evidence for the appellant on the issue of insanity was probably sufficient under the scintilla rule to authorize a submission of the case to the jury, we are of opinion that it is not sufficient to sustain the verdict in view of the overwhelming character of the evidence to the contrary.

Appellant was examined by a number of reputable physicians prior to the commission of the act of which he is charged, and by all of them declared to be insane. On the day before he shot Mrs. Burns he was examined by Dr. Vest at Huntington, W. Va., and Dr. Vest refused for the second time to receive him in the hospital of which he had charge, because appellant was insane, and advised the members of his family who were present to place him in an institution for the insane. Steps were then taken to incarcerate him in a state institution preparatory to an effort to secure his admission to a federal hospital for mental cases. It appears that he had served in the United States Navy, and his family assumed that he was eligible for admission to a federal institution maintained for ex-service men of the army and navy. Pending proceedings necessary to procure his admission to such an institution, he was taken from Huntington, W. Va., to his parents' home at Coal Grove, Ohio, just a few hours

beföre he shot his wife and her mother. It is shown that he talked incoherently both before and after the shooting. His relatives and acquaintances and all of the physicians who examined him considered him to be insane. There is little evidence to the contrary. The conversation related by the witness, Storey, was trivial. The testimony of William Callon would tend to indicate that appellant retained some reasoning power, but it is a matter of common knowledge that persons known to be insane frequently exhibit signs of shrewdness.

We are fully aware that the defense of insanity in criminal cases is frequently, if not usually, devoid of merit, but the defense in the present case is clearly an exception to the general rule. It is unfortunate that the law makes no provision for the compulsory confinement of the criminal insane for the protection of society, but the absence of such a provision does not authorize the punishment as a criminal of a person mentally irresponsible for his acts. After a careful consideration of the record in this case we have concluded that the verdict is flagrantly against the evidence. No other questions are passed on.

Judgment reversed, with directions to grant appellant a new trial.